UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ERNEST VENTRESS, JR, and BETTY VENTRESS,<br>Plaintiffs | CIVIL ACTION NO.: 11-1419<br>SECTION: |
| VS. | |
| RADIATOR SPECIALTY COMPANY AND THE DOW CHEMICAL COMPANY<br>Defendants | JUDGE:<br>MAGISTRATE: |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**Plaintiffs' Original Complaint**

The plaintiffs, **Ernest Ventress, Jr., and Betty Ventress,** through their attorneys, file this Complaint as follows:

**Parties**

1.

A. *The Plaintiffs*

The plaintiffs are:

i. **Ernest Ventress, Jr.,** a major domiciled in, Iberville Parish, Louisiana;

ii. **Betty Ventress, wife of Ernest Ventress** and a major domiciled in, Iberville Parish, Louisiana;

B. *The Defendants*

The defendants are:

i. **Radiator Specialty Company**, a North Carolina corporation, with it's principal business office in North Carolina, and whose mailing address is 1900 Wilkinson Boulevard., Charlotte, North Carolina 28208.

ii. **The Dow Chemical Company** a Delaware corporation, authorized to do and doing business in Louisiana, with its principal business office in Michigan, and whose agent for service of process is CT Corporation System, 5615 Corporate Blvd. Ste 400B, Baton rouge, LA 70808.

**Jurisdiction and Venue**

2.

This Court has jurisdiction under 28 U.S.C. §1332 in that there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

3.

This Court has personal jurisdiction over the defendants who are doing business in the district or who did business in this district at a relevant time.

4.

The defendants are incorporated under the laws of North Carolina, and Delaware, with their principal places of business in North Carolina, and Michigan. Plaintiffs are domiciled in Iberville Parish, Louisiana. None of the Defendants are domiciled in Louisiana. Therefore, there is complete diversity in this matter.

5.

Venue is proper in this district under 28 U.S.C. § 1391 (b)-(c) because the defendants are doing business in this district and because the events giving rise to the plaintiffs' causes of action arose in this district (Plaquemines Parish). Moreover, the acts, omission, occurrences **and** injuries at issue occurred and the damages were sustained in Plaquemines Parishes.

**Background**

6.

Ernest Ventress, Jr. (hereinafter "Mr. Ventress") worked as a contract laborer for National Maintenance, and for Turner Industries from 1971 until the late 1980's. During this time he performed contract labor at the Dow Chemical Co. in Plaquemines parish, Louisiana. His job classifications were "Pipefitter Trainee" and "General Pipefitter". He was assigned Pipefitting work at the Chlorine Plant, the Benzene gasoline, propylene, and butadiene areas at the Dow Chemical plant. He worked in areas which contained benzene, gasoline, propylene and butadiene. Mr. Ventress' tasks included new construction and "turnarounds".

7.

Mr. Ventress was employed as a contract worker for Jacob Field Services ("Jacob") from the late 1980's until retirement in 2005. While employed with Jacob's he continued to work as "General Pipefitter" and later as a "Pipefitter Foreman". While working for Jacob's he was assigned to pipefitter work at the Dow Chemical plant in Plaquemines Parish, Louisiana. He was assigned to work on new construction and turnarounds in the Chlorine Plant, the Benzene area and other portions of the plant .

8.

Ernest Ventress ("Mr. Ventress") regularly used or was exposed to Benzene, Toluene and Xylene (BTX), paint, solvents, gasoline, propylene, butadiene and Liquid Wrench while working at the Dow Chemical facility in Plaquemines Parish.

9.

Mr. Ventress used or was exposed to Liquid Wrench, produced by Radiator Specialty Co., from 1970 through 1978 while performing maintenance work, turnarounds and new

construction. From 1970 to 1978 he used Liquid Wrench at work, to free up seized nuts & bolts; and was frequently nearby when others were using Liquid Wrench. Liquid Wrench contained up to 30% benzene. Mr. Ventress was exposed to benzene in Liquid Wrench from 1970 to 1978.

10.

The products Mr. Ventress used or was exposed to at the Dow Chemical plant, were manufactured, supplied, distributed and sold by defendant Dow Chemical Company.

11.

On July 1, 2010, Mr. Ventress was diagnosed with Multiple Myeloma (MM) as a result of his exposure to benzene and chemicals during his work at the Dow Chemical facility. He did not learn that benzene exposure could cause Multiple Myeloma until he was informed by his diagnosing physician in July of 2010. No one from Dow Chemical or any of its supervisors warned him that exposure to benzene could cause cancer.

12.

At all material times herein, defendants, Dow Chemical Co., and Radiator Specialty Company were manufacturers, distributors, sellers and, suppliers, of benzene or benzene-containing products.

13.

Petitioner was exposed to significant quantities of benzene, benzene containing products, and butadiene as a result of the acts or omissions of Dow Chemical. This exposure was a substantial contributing cause in Mr. Ventress's development of Multiple myeloma

14.

While exposed at the work site described above, petitioner was exposed to dangerously high levels of benzene and other products containing benzene which were unreasonably dangerous materials.

15.

While working at the Dow Chemical plant in Plaquemines Parish, Louisiana, Mr. Ventress was exposed daily to high levels of benzene, butadiene and other chemicals when he performed assigned tasks. He was exposed to high levels of benzene, butadiene and other chemicals from chemicals manufactured, distributed or sold by the Defendants.

16.

Mr. Ventress sustained tissue damage from each exposure to benzene and butadiene resulting in distinct bodily injuries in every year from 1971 through 2005.

17.

As a direct and proximate result of exposure to benzene and products containing high levels of benzene, Mr. Ventress suffered injury including, but not limited to, Multiple Myeloma physical damage, severe physical and mental pain, fear of further disease processes, disability, medical expenses, and loss of enjoyment of life.

18.

The causal connection between Mr. Ventress's injuries and benzene has been scientifically documented since 1948.

19.

The development of Multiple Myeloma as a result of chronic benzene exposure has been

well documented, and death resulting from Multiple Myeloma has been associated with benzene exposure.

20.

Multiple Myeloma is a malignant disease that affects the blood and bone marrow.

21.

Scientists have linked Multiple myeloma, leukemias, myelodysplastic syndrome (MDS), aplastic anemia, pancytopenia, cytopenias, myelofibrosis, and polycythemia vera to benzene exposure.

22.

The latency period for the development of injuries after benzene exposure has been known to range from less than 5 years to in excess of 50 years.

23.

Practically all of the adverse chronic effects of exposure to benzene and its oxidation products are a result of their influence on the blood forming system.

24.

The health hazards of benzene have been recognized for over one hundred years. Benzene has been recognized as a carcinogen known to cause leukemia. By the end of 1948, it was widely known to those in defendants' industry in the United States, as well as the named Defendants and their predecessors, that exposure to benzene could cause a myriad of ill health effects including such diseases as leukemia, multiple myeloma, lymphoma and other blood disorders.

25.

Through industry and medical studies unknown to plaintiffs, the Defendants knew or

should have known of the health hazards inherent in the products they manufactured, distributed, sold, supplied, owned, transported, or used. The actions or inactions of the defendants constitute gross negligence and demonstrate a reckless disregard for the rights and safety of others. Furthermore, the defendants committed numerous tortious acts that include, without limitation, negligently misrepresenting, concealing, suppressing, omitting material information about the health effects of benzene and failing to inform users of precautionary measures to be used when handling or near benzene, as specifically alleged below.

26.

Exposure to benzene occurs through inhalation and skin contact. Chronic benzene poisoning results from repeated or continuous exposure to relatively low concentrations of benzene vapors.

27.

Long-term benzene exposure may adversely impact marrow and bone production. Breathing benzene can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Breathing very high levels of benzene can also result in death. Eating or drinking foods containing high levels of benzene can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death.

28.

Serous health hazards associated with inhalation of benzene vapor has been known since the 1930's. In 1941 both the US Public Health Service and the American Standard Association developed recommendations to control worker exposure to benzene. *Benzene (Benzol): Its Toxicity and Potential Dangers*, Division of Industrial Hygiene, National Institute of Health, U.S. Public Health Service, 1941; *American Standard-Allowable Concentration of Benzene,*

American Standards Association, N.Y., Z37.4-1941.

29.

In the September 1948 Edition of the American Petroleum Institute, _Toxicological Review Benzene_, the authors recommended precautionary measures for workers who are exposed to benzene. [attached as Exhibit A]. Furthermore, the review stated that benzene use was extensive in the petroleum industry with the greatest amount of benzene blended into gasoline

30.

As of 1948, the American Standards Association and most states had set an arbitrary limit of 100 ppm as the maximum permissible benzene concentration for workers exposed to this substance during an 8-hour day. In 1948, the American Petroleum Institute reported that "In as much as, the body develops no tolerance to benzene, and as there is a wide variation to individual susceptibility, it is generally considered that the only absolute safe concentration for benzene is zero." *Id.* at API 1948. The concentration of benzene vapor in the air should be checked regularly in situations where excessive exposures are apt to be encountered.

31.

The safety measures necessary for the prevention of benzene poisoning are primarily those designed to prevent the inhalation of benzene vapor. Ventilation should be designed to prevent toxic concentrations of the vapor from reaching the breathing zone of individuals who may potentially be exposed. Individuals who must be exposed to benzene vapor should be rotated to reduce their exposure time to a minimum. When excessive concentrations are unavoidably encountered in operations—such as the cleaning of tank cars, vats, storage tanks—a supplied air respirator or self-contained breathing apparatus with full face shield should be employed. Skin contact and possible dermatitis from benzene should be avoided entirely if

possible; but, if the hands must contact the solvent, then neoprene gloves or protective creams should be used.

32.

In 1950 the National Safety Counsel reviewed the hazards associated with benzene. The NSC stated:

> Chronic benzene poisoning affect the blood and blood forming organs, producing serious degeneration in the bone marrow. . . There is no way to determine the sensitivity of an individual beforehand. Cases of fatal poisoning have been recorded from very light exposures to benzene. Benzene (Benzol), Data Sheet D-308,, National Safety Council, 1950. (attached as Exhibit B)

33.

By 1969, the United States of America Standards Institute set maximum benzene exposure levels to 10 ppm as a weighted average for an 8 hour day. *USA Standard- Acceptable Concentrations of Benzene*, United State of America Standards Institute, New York 1969. This standard was adopted by the U.S. Department of Labor. (attached as Exhibit C). In 1977 OSHA set an Emergency Temporary Standard for benzene at 1 ppm of an 8 hour weighted average, with a maximum limit of 5 ppm.

34.

The Defendants knew or should have known about the causal relationship between benzene and cancer-related illnesses. The Defendants failed to warn Mr. Ventress and other similarly situated workers about the health hazards associated with benzene.

35.

The Defendants have committed negligence, gross-negligence and are strictly liable for the damages caused by their products. Defendants are at fault for Mr. Ventress's injuries as outlined in this complaint.

## Liability of Dow Chemical

36.

The exposure of petitioner to benzene and benzene containing products as a result of the acts or omissions of Dow Chemical Co. was a substantial contributing cause in development of his Multiple Myeloma. Dow Chemical Co. had the responsibility for protecting the health and safety of the contract employees working at its facilities.

37.

When the petitioner inhaled or otherwise ingested, these dangerous and toxic substances including but not limited to benzene and benzene containing chemicals it caused irreparable harm and progressive damage to the blood and blood forming organs leukemia.

38.

Louisiana C.C. 2315 provides, "Every act whatever of man that caused damages to another obliges him by whose fault it happened to repair it." Dow Chemical is liable to Mr. and Mrs. Ventress for the damages caused by Mr. Ventress' exposure to benzene containing products and other hazardous substances while performing work at the Dow Facility.

39.

The Dow Chemical Company had the responsibility to provide Mr. Ventress with a safe place to work, and adequate protective equipment with which to perform his work. They negligently failed to discharge said responsibility. Dow Chemical Co. was negligent in the following, non-exclusive particulars:

a. by not requiring petitioners to wear the proper respiratory protective equipment when working with benzene, benzene containing products and butadiene;

b. by failing to make available to the petitioners proper respiratory protective equipment for use when petitioner was in a benzene and butadiene contaminated work environment;

c. by failing to warn or inform petitioner regarding the health hazards involved in the inhalation of benzene, benzene containing products and butadiene;

d. by failing to implement the proper engineering controls, including providing adequate ventilation, to eliminate and/or reduce the hazards of exposure to benzene, benzene containing products and butadiene;

e. by failing to implement a proper safety program;

f. by failing to train and instruct petitioner regarding the purpose, use, and limitations of the respiratory protective equipment;

g. by failing to maintain, repair, replace and make available necessary respiratory protective equipment and/or the components thereof;

h. by not requiring or providing protective clothing for dermal exposure;

i. by failing to monitor and/or evaluate the fume levels in the work environment to ensure that the plaintiff was not exposed to dangerous levels of benzene, benzene containing products, and butadiene;

j. and other acts of negligence which may be revealed at the trial of this matter.

Furthermore, Dow Chemical Co. failed to warn the petitioner and concealed the dangers of benzene, benzene containing products , and butadiene in order to avoid litigation and costs associated with providing a safe work environment.

40.

Dow Chemical is liable for its acts and omissions to the Petitioner.

## Negligence

41.

The Defendants Dow Chemical, and Radiator Specialty Co. breached duties owed to Mr. Ventress and the plaintiffs to exercise proper care in manufacturing and selling their respective products. More specifically, they breached the following duties:

a. to design their products to contain available and suitable products other than benzene;

b. to sell benzene-free products;

c. to select materials other than benzene for inclusion into their products;

d. to fully test their respective products for health risks associated with the normal and intended use of their products;

e. to fully instruct and warn users and bystanders in the uses of their respective products so as to eliminate or reduce the health hazards associated with their normal and intended use;

f. to fully warn foreseeable users and bystanders as additional medical knowledge became available concerning the health hazards associated with their products;

g. to recall their products upon discovering, or at the time they should have discovered, the health hazards associated with those products;

h. to inspect fully and adequately the design, selection, testing, instruction and warnings that should have accompanied the sale of such products;

i. to refrain from negligently misrepresenting the safety and health risks of the products they sold;

j. to inquire about or investigate the safety and health risks of the products they sold;

k. to research, study and be aware of medical and scientific studies concerning the health hazards of benzene; and

l. To protect workers and other invitees to the Dow Chemical facility from hazardous and toxic chemicals including benzene containing products;

m. To provide personal protective equipment to workers and invitees at the Dow Chemical facility to protect from exposure to hazardous and toxic chemicals, including benzene

n. To educate and/or train workers and other invitees regarding the health hazards of the chemicals on site, the hazardous or toxic nature of these chemicals, or the appropriate protective equipment needed when near these hazardous or toxic chemicals.

o. other acts which may be revealed at the trial of this matter.

42.

As a direct and proximate result of the Defendants' negligent breach of their duties, the Petitioners have sustained injuries, damages and losses. The scope of the duties breached by the defendants encompasses the risk of the injuries sustained by the Plaintiffs. The duties breached were intended to protect the Plaintiffs from the type of injuries they have sustained. The Defendants' breaches of their duties constitute the direct legal cause of the injuries to the Plaintiffs. The Defendants are thus jointly and solidarily liable for all damages caused by their breaches.

**Strict Product Liability**

43.

Exposure to benzene from the Defendants' products and/or chemcials under their care, custody and control resulted from the normal, foreseeable, and intended use of the products,

without substantial change in the condition in which the defendants sold or supplied these products. Defendants are strictly liable for the damages caused by their products.

44.

The Defendants' products were defective, presented an unreasonable risk of harm, and were unreasonably dangerous under normal use while in the Defendants' custody, and at the time the products left the respective defendants' control.

45.

Mr. Ventress was an intended and foreseeable user of the alleged defective products. Defendants could reasonably have anticipated the damages and losses to the Plaintiffs.

46.

The defects in the Defendants' products and chemicals include, but are not limited to, the following:

a. The products were unreasonably dangerous per se in that the damage in fact of using the product outweighs the utility of the product under normal, foreseeable use.

b. The products are unreasonably dangerous per se because the cost of injuries as a result of the benzene content of the products, outweighed the benefits of use of benzene in the product

c. The chemical's inherent characteristics (known to the Defendants) that gave the products such a potential for causing health problems as to render the products unreasonably dangerous per se;

d. lack of warnings or lack of sufficient warnings of the inherently dangerous properties of the products when used in the fashion in which they were anticipated or should have been anticipated being used;

e. lack of warnings or lack of sufficient instructions for eliminating the health risks inherent in the use of the products;

f. lack of sufficient inspections by the Defendants of their products to ensure that such products contained sufficient warnings of the dangerous properties of the products;

g. lack of reasonable inspections by the defendants of their products to ensure that such products/chemicals contained sufficient instructions for eliminating or minimizing the

health risks inherent in the use of the products/chemicals;

h. lack of tests or lack of sufficient tests to determine the effect of benzene vapors on intended users and bystanders;

i. defective designs calling for the inclusion of benzene in products that did not require benzene, when alternative, equally suitable substances were available, and

j. other acts which may be revealed at t trial of this matter.

47.

Defendants sold their products with conscious disregard for the safety of users of the products and other persons who might be injured thereby.

48.

As a result of the defective and unreasonably dangerous condition and composition of the benzene-containing products manufactured, distributed and/or sold by all defendants, Mr. Ventress inhaled benzene fumes and other harmful substances emitted by the normal use of the products, proximately causing multiple myeloma related to benzene exposure from which he suffers and for which these defendants are strictly liable under Louisiana law.

49.

**Strict Product Liability and Failure to Warn for Liquid Wrench**

Radiator Specialty Company's Liquid Wrench is strictly liable for the damages caused by its products under because its products were (1) Unreasonably dangerous per se; 2) Unreasonably dangerous in construction; 3) Unreasonably dangerous in design; and *Halphen v. Johns-Manville Sales Corp.*, 484 So.2d 110 (La. 02/24/86).

50.

Liquid Wrench was unreasonably dangerous in construction or composition. At the time it left control of the manufacturer, it contained high concentrations of a cancer causing substance, benzene, which made the product more dangerous than it was designed to be.

51.

Liquid Wrench was unreasonably dangerous per se. The danger of use of the product, whether foreseeable or not, outweighed the utility of the product.

52.

Liquid Wrench is unreasonably dangerous in design. Liquid Wrench was manufactured with constituents that contained high levels of benzene. Less toxic and cheaper design alternatives were available at the time of manufacture.

53.

Liquid Wrench was unreasonably dangerous in design because RSC failed to conduct adequate research and investigation into the health effects of their products.

54.

As the product designer and manufactures RSC has a duty to keep abreast of scientific knowledge and discoveries. RSC had a duty to test and inspect its products. RSC breached these duties.

**Article 2317 Liability**

55.

Mr. Ventress's Multiple Myeloma was caused by an unreasonably defective thing that was within the defendants' care, custody or control, namely, benzene, benzene-containing chemicals and butadiene. Since Mr. Ventress suffered these exposures while former Article 2317 of Louisiana Civil Code was still in effect, it governs here. It provided:

> "We are responsible, not only for the damages occasioned by our own act. but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody . . ."

In interpreting this Article the Louisiana Supreme Court in *Loescher v. Parr* determined that when harm results from a defect in a thing that creates an unreasonable risk of harm to others, the person legally responsible for the custody of that thing may be held liable for the resulting damages, even though no personal negligent act or inattention on the person's part is proved. This liability arises from the person's legal relationship to the thing that presents an unreasonable risk of harm to others. Under former Article 2317, a plaintiff must prove:

a. The thing in question was defective, which means that it posed an unreasonable risk of harm;

b. It was in the garde (i-e., care, custody or control) of the defendant, and

c. The plaintiff was damaged as a result of the defect.

56.

When Mr. Ventress was exposed to benzene, benzene-containing chemicals or butadiene of Dow Chemical at its facility in Plaquemines Parish. Dow Chemical had control and custody of the hazardous and toxic chemicals to which Mr. Ventress was exposed, because they stored, supplied, manufactured, distributed and sold the benzene and benzene containing products at their facility.

57.

Dow Chemical breached its duties, as owners and operators of the facility, to provide a safe workplace for Mr. Ventress. As a contract employee and invitee, Dow Chemical owed a duty of reasonable care to Mr. Ventress

58.

Dow Chemical continues to be liable to Mr. Ventress under the revised Article 2317. Dow Chemicals was in custody and control of the dangerous and defective substances and facility which caused Mr. Ventress's injuries. Dow Chemical either knew or reasonably should have known that their contract workers were exposed to benzene while working on their facility in Plaquemines Parish Louisiana. Additionally, Dow Chemical knew or should have known that exposure to benzene caused blood disorders and blood cancers.

**Compensatory Damages**

59.

As a result of the acts and omissions of the Defendants, the Plaintiffs are entitled to recover money damages, both past and future, for all elements of damages allowed by Louisiana law. These damages include but are not limited to:

a. Past, present, and future physical pain and suffering;
b. Past, present, and future mental anguish and emotional distress;
c. Disfigurement and embarrassment;
d. Physical impairment;
e. Past and future earnings;
f. Lost earning capacity;
g. Physical Impairment;
h. Physical and mental disabilities;
i. Past, present, and future medical care, convalescence, mental and physical therapy and all other health care expenses;
j. Loss of enjoyment of life;
k. Fear of cancer and other diseases;

l. Expenses to train, educate or otherwise enable the plaintiffs to be gainfully employed;

m. Loss of society, consortium, companionship, services, nurture, and love and affection;

n. Wrongful death damages; and

o. Survival damages.

**Jury Trial**

60.

The plaintiffs pray for trial by jury.

**Discovery Rule**

61.

The prescriptive period does not start until the plaintiffs knew or should have known that the plaintiff's Multiple Myeloma was caused by benzene. Here, the results of the plaintiff's exposure to benzene was inherently undiscoverable. The cancer took years to develop.

62.

Mrs. Ventress did not learn of his diagnosis of Multiple Myeloma until July, 2010, and did not learn of a possible connection between the benzene he was exposed to and his illness until after his diagnosis. Mr. Ventress filed suit within less than one year of learning that his Multiple Myeloma was caused by his exposure to benzene The limitation period didn't start until after July of 2010, when the plaintiff learned about the cause of his Multiple myeloma.

**Intentional Tort**

63.

Plaintiffs incorporate herein each allegation set forth above. Dow Chemical was well aware of the serious health hazards associated with use of benzene. Consequently, if companies such as Dow Chemical had concern for the health and well-being of workers using

and/or being exposed to benzene and benzene-containing products, they should have provided information and warnings on the need to limit exposures, educated workers, measured airborne exposure levels, provided adequate and safely designed protective equipment, and conducted medical examinations.

64.

The actions and inactions of the Dow, whether taken separately, or together, were of such a character as to constitute a pattern or practice of intentional wrongful conduct and/or malice resulting in damage and injury to the Plaintiffs. More specifically, Dow Chemical consciously and/or deliberately engaged in oppression, fraud, wantonness and/or malice with regard to Welman Ventress and other employees. Therefore, Dow Chemical should be held liable for the intentional infliction of physical injury upon its employee, Mr. Welman Ventress.

65.

Mr. Ventress's Multiple Myeloma was a natural, direct and/or probable consequence of his exposure to benzene and benzene-containing products. Dow Chemical intentionally exposed Mr. Ventress to benzene and benzene-containing products by the conditions of work it imposed upon him. Dow Chemical actually knew that the conditions of work would cause exposure to benzene and benzene-containing products, and that such exposure would cause injury. Exposure to benzene and benzene- containing products is a harmful or offensive bodily contact. Dow Chemical knowingly and intentionally exposed Mr. Ventress to benzene and benzene-containing products that caused injury. Mr. Ventress's exposure led directly to the development of Multiple Myeloma. Therefore, Employer Defendant intentionally exposed Welman Ventress to benzene and benzene-containing products with the knowledge that such exposure was substantially certain to cause serious injury to Mr. Ventress including damage to his blood.

66.

Dow Chemical knew within a substantial certainty that the conditions of work which it imposed upon Mr. Ventress and over which it had total control, would result in offensive touching, offensive contact and exposure to benzene and benzene-containing products. For many years, the Dow Chemical actually knew that exposure to benzene and benzene- containing products could naturally, directly and probably result in blood disease and blood cancers, including Multiple Myeloma. However, Dow Chemical intentionally chose to continue its course of conduct and allowed workers such as Mr. Ventress to be exposed to benzene and benzene-containing products.

67.

The above conduct, as well as other conduct on the part of the Dow Chemical, constitutes outrageous conduct and conduct which the Dow Chemical knew to a substantial certainty would cause exposure to benzene and benzene-containing products from which all manner of damages would flow, including, but not limited to:

**a.** Benzene and benzene-containing products-related disease;

**b.** Leukemia, blood disorders, other related conditions, resulting pain, suffering and mental anguish;

**c.** Emotional distress.

68.

The extent of danger from contact with benzene and benzene-containing products was affirmatively withheld and/or concealed from Mr. Ventress. As such, his contact and exposure to benzene and benzene-containing products was without his consent or his informed consent.

69.

Dow Chemical was fully aware of the presence of benzene and benzene-containing products in the ambient air, knowing that this toxin would be inhaled by persons such as Mr. Ventress.

70.

Dow Chemical failed to adequately train Mr. Ventress of the health hazards associated with benzene and benzene-containing products. Dow Chemical failed to provide adequate personal protective equipment to its employees. Dow Chemical also failed to develop and implement work practice procedures to ensure that Mr. Ventress were not exposed to benzene and benzene-containing products while he performed his various job duties.

**Prayer**

71.

For these reasons, the plaintiffs ask that Dow Chemical Co., and Radiator Specialty Co. be cited to appear and answer, and that on final trial, the plaintiffs have:

a. Judgment against Dow Chemical Co., and Radiator Specialty Co. for any and all damages and the actual and special damages suffered by the plaintiffs as a result of Defendant's conduct;
b. Costs of suit;
c. Prejudgment and post-judgment interest at the highest rate provided by law; and
d. All other and further relief to which the plaintiffs may be entitled.

Respectfully Submitted:

/s/ L. Eric Williams, Jr.
L. Eric Williams, Jr. (La. Bar No. 26773)

**Williams Law Office, LLC**
433 Metairie Road, Ste. 404
Metairie, Louisiana 70005
Telephone: (504) 832-9898
Facsimile: (504) 832-9811

&

*s/ Amber E. Cisney*
RICHARD J. FERNANDEZ, LSBN 05532
AMBER E. CISNEY, LSBN 28821
**RICHARD J. FERNANDEZ, LLC**
3000 West Esplanade Avenue, Suite 200
Metairie, Louisiana 70002
Telephone: (504) 834-8500
Facsimile: (504) 834-2609
**ATTORNEYS FOR PLAINTIFF**